UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK B. VAUGHN,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Civil No. CV 09-01351 DSF(PLAx)<br><br>IN ADMIRALTY<br><br>SECOND AMENDED<br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

This case having come on for trial without a jury, and the Court having heard live testimony and reviewed designated deposition testimony, and having duly considered the evidence of record, the credibility of the witnesses, the entire file of the Court, and the contentions and arguments of counsel, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT[1]/

1. On February 25, 2009, Plaintiff Patrick Vaughn filed this action

---

[1]/

These Amended Findings clarify the issue raised in the United States *ex parte* Application Requesting that the Court Clarify Findings of Fact and Conclusions of Law Rendered After Trial. No other changes have been made.

1

seeking damages under the Jones Act for negligence and for unseaworthiness[2] in connection with an alleged injury suffered in early March 2007 while he was a member of the crew of the Cape Jacob.

2. The Cape Jacob is a public vessel owned by the United States by and through the Department of Transportation, Maritime Division ("MARAD") and operated by Matson Navigation Company.

3. Plaintiff asserts he was injured on March 4, 2007, while the crew of the Cape Jacob was involved in the task of "switching out" four life raft canisters on the vessel.[3] Older expired canisters were to be replaced by newer canisters while the ship was docked. The vessel carries 12 such canisters. Life raft canisters are required to be replaced every year. This project has been referred to as an "evolution." The evolution was comprised of numerous distinct tasks. Palletized replacement canisters were lifted aboard the vessel by crane and placed on the main deck. The replacement canisters then had to be moved to a different location, referred to as the staging point, where they could be lifted from the main deck to the bridge wing or bridge deck. The process took place in reverse to remove the expired canisters from the vessel.

4. Plaintiff contends the United States is liable for damages because (1) Matson failed to perform a "job hazard analysis," and (2) the vessel's boatswain Michael Henderson ordered Plaintiff to "mule haul" the canisters rather than use a

---

[2]/ Plaintiff also sought maintenance and cure, but now agrees all sums due on this claim have been paid.

[3]/ The United States contends that Plaintiff was not injured while aboard the Cape Jacob, or at least not while moving life raft canisters. Because resolution of this dispute is not necessary to the Court's ruling, the Court assumes for the purpose of these findings only, that Plaintiff injured his back at some time during the evolution.

2

1. forklift.

5. The testimony of the various witnesses differs significantly in material respects, because of one or more of the following: their different locations at the time of the evolution, the passage of time between the evolution and their testimony, erroneously refreshed recollection, lack of truthfulness.

6. There is almost no aspect of the evolution on which there is agreement, including the number of days that it took to complete it, the distance the canisters had to be moved by Plaintiff and those assisting him, the location of various crew members at various times, the specific tasks crew members were performing and the number of crew members assigned to each task at various times, Henderson's location at various times, the location of the forklift when the injury occurred, the location of the vessel itself, the point in the evolution at which Plaintiff first expressed concern about his back, etc.

7. At the time of the evolution, Plaintiff was a 44 year-old able-bodied seaman with more than ten years experience as a merchant seaman. He was a qualified boatswain (though he had never served as a boatswain) and a qualified forklift operator.

8. As evidenced by his signature on Exhibit 121, Plaintiff attended a safety meeting on board the Cape Jacob on February 6, 2007, which included the topic of "back injury, slips trips and falls." A video was shown demonstrating proper lifting techniques. Plaintiff had also seen the video on at least one other occasion before that date.

9. At the time of the evolution, Plaintiff was the union delegate aboard the Cape Jacob. As the union delegate, the sailors would bring any concerns they had to Plaintiff - including safety concerns - and he would bring them to the chief mate or the captain.

10. On the morning of March 4, Plaintiff was assigned the task of

preparing the canisters to be lifted up to the bridge wing. Justin Foster, an ordinary seaman, was assigned to help Plaintiff. In order to accomplish this task, the canisters had to be moved from their initial location after arrival on the vessel to the staging area on the main deck, where they could be lifted to the bridge wing.

11. Plaintiff used a forklift in the morning to move the canisters the approximately 20 feet to the staging area. (This is Plaintiff's estimate. Other estimates range from 30 to 60 feet. There apparently is no way to determine the actual distance because the evolution can not be recreated.) Plaintiff contends that he was initially instructed by Henderson to use the fork lift. Henderson did not recall giving instructions about how to accomplish that task, as opposed to the task of lifting the canisters to the bridge wing. The Court need not resolve the issue, especially as it appears that Henderson would have instructed Plaintiff to use a forklift if he had given him any instruction at all.

12. The crew took a lunch break. The crew was assigned a different task after lunch, and did not continue with the evolution until 3:15 or 3:30. At that time Brian McCarthy, another ordinary seaman, was assigned to assist Plaintiff and Foster.

13. Plaintiff sent Justin Foster "topside" to assist with a different aspect of the evolution. McCarthy testified that Plaintiff did so on his own initiative. That left only McCarthy to assist Plaintiff. Plaintiff denies having sent Foster away, but does not explain why Foster left. The Court finds McCarthy's testimony convincing on this point. He has no apparent bias or motive to lie and his memory was clear on this issue. Having observed the demeanor and manner of Plaintiff while testifying, the Court finds his vehement denial to be lacking in credibility.

14. Plaintiff has failed to establish that Henderson told him not to get the forklift, and the Court finds Henderson did not do so. Plaintiff contends that in the afternoon he and Henderson were walking together toward where the evolution

was to begin again.  Henderson allegedly was angry, having just argued with Brian Koppel, the chief mate, about the speed with which the evolution was being completed.  Plaintiff related a summary of the argument, which he testified to having heard.  Plaintiff contends that when Plaintiff told Henderson that he would continue the task with the forklift (which he alleges had inexplicably been moved to a garage 50 - 100 feet away), Henderson ordered him not to get the forklift, but instead to "mule haul" the canisters.  Plaintiff testified that he was not concerned when he was told to "mule haul" the canisters, but that he believed using the forklift was easier and safer.  He further testified that he followed Henderson's orders because he did not want a confrontation and was afraid he might be fired and would have to return to the United States at his own expense.  Henderson testified that there was no such argument with Koppel and he never gave Plaintiff such an instruction.  Koppel testified that there was no such argument.  Plaintiff contends the testimony of able-bodied seaman Brian Yost supports his version but Yost's version of the facts differs so significantly that it does nothing to assist Plaintiff.  Yost testified he was 70 feet from Plaintiff and McCarthy on the main deck at the time.  He said he was 100 feet from Henderson, who was on the platform on the level above Plaintiff.  Among other things, Yost said Plaintiff had the canister on the fork lift and had set it down in the wrong position.  He heard Koppel "holler up" to Henderson, telling him to hurry to get the job done.  Then Henderson "hollered down" to Plaintiff to forget the forklift.  At the time the instruction was given, the forklift was 10 to 15 feet away - rather than in the garage as Plaintiff testified.  Yost's testimony on this point is not credible when considered in connection with the rest of his testimony.  On cross-examination, he testified that he did not hear the conversation between Koppel and Henderson.  His description on cross-examination of the conversation relating to the forklift bore little resemblance to his description on direct examination and neither description

5

resembled the version of the conversation as related by Plaintiff. Yost admitted to having discussed the incident with Plaintiff several months before Yost's deposition was taken. McCarthy, who was undoubtedly closer to Plaintiff at the time testified: " I think I remember something about a forklift was being used before I arrived. I do recall something to that effect." This testimony is not necessarily supportive of Plaintiff's position that Henderson ordered Plaintiff not to get the forklift. In any event, the testimony has almost no probative value, as McCarthy does not recall the specific comment, when or where it was made, or who made it. Having considered the totality of the evidence and the demeanor and manner of Plaintiff while testifying, the Court concludes Henderson did not tell Plaintiff he could not use a forklift to move the canisters.

15. Plaintiff could have used a forklift to move the canisters if he wanted to and did not need to ask permission from anyone to do so. He admitted that he had no concern about moving the canisters without the use of a forklift. The Court finds that his testimony that he complied with Henderson's alleged order because he did not want a confrontation and did not want to be fired lacks credibility.

16. When Plaintiff hurt his back, McCarthy suggested he should take a break, but Plaintiff declined to do so, and continued to move the canisters.

17. There is no dispute that the vessel was properly manned and properly equipped. There were sufficient crew members to accomplish the evolution safely. A forklift was available if needed, and had previously been used by Plaintiff, a qualified forklift operator.

18. The positioning, moving, and slinging of the canisters so they could be hoisted to the bridge wing of the vessel involved typical seaman's work that did not require a hazard analysis. The Court finds the testimony of Defendant's expert more persuasive than that of Plaintiff's expert, and to be more consistent with the facts and the relevant law. Virtually everyone testified that lifting and moving

heavy objects was standard work on the Cape Jacob. Meetings occurred before both the morning and afternoon work at which any safety concerns could have been raised. In any event, Plaintiff has not even suggested what might have occurred at a formal hazard analysis that would have had any impact on the events of March 4.

19. Life raft canisters, though heavy, can be pushed rather easily without injury. Testimony about 50 pound limits for lifting, even if such limits exist, is not relevant. Plaintiff was not required to lift the canisters - individually or with assistance. He was provided with two ordinary seaman to assist in moving the canisters in the manner he deemed appropriate.

20. There was no negligence on the part of the United States, or any of its agents or employees. No act or failure to act of the United States or any of its agents or employees caused, or contributed in any manner to Plaintiff's injuries.

21. The Cape Jacob was fit for its intended purpose and no unseaworthiness of the vessel caused, or contributed in any manner, to Plaintiff's alleged injuries. The vessel was equipped with everything necessary to move the canisters safely, Plaintiff was provided with sufficient assistance to move the canisters, and Plaintiff was not compelled to use an unsafe means to move the canisters.

22. Plaintiff's damages, if any, were caused by his own failure to use proper lifting techniques and his decision to move the canister without the help and equipment provided to him.

23. The Court finds that the further factual findings requested by the parties are either unsupported or unnecessary to the Court's determination.

24. Any finding of fact that constitutes a conclusions of law shall be treated as such.

**CONCLUSIONS OF LAW**

1. Plaintiff's claims are admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The United States of America has waived its sovereign immunity from suit and consented to be sued, if at all, pursuant to the provisions of the Clarification Act, 50 App. U.S.C.A. §1291, which incorporates the consistent provisions of the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §30901, *et seq.*, as well as the Public Vessels Act, 46. U.S.C. § 31101, *et seq.*

2. Under the Public Vessels Act, an injured party has no greater claim against the United States than one would have against a private person under similar circumstances. *See Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 227-28 (1945).

3. At the time of Plaintiff's injury he was employed by Matson Navigation Company as an able-bodied seaman aboard the Cape Jacob. Plaintiff's negligence cause of action against the United States is therefore based on the Jones Act, 46 U.S.C. § 30104. In addition, he asserts that the vessel was unseaworthy, giving rise to liability under general maritime law.

4. "It is well established that a seaman cannot recover against a vessel for injuries sustained if they were caused proximately and solely by his own negligence." *Moore v. United States*, 347 F. Supp. 38, 41 (N.D. Cal. 1972).

5. A shipowner is not required to furnish a seaman with an accident-free ship. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960); *Reinhart v. United States*, 457 F.2d 151, 152 (9th Cir. 1972). "The owner is not an insurer." *Lieberman v. Matson Navigation Co.*, 300 F.2d 661, 662 (9th Cir. 1962). The mere fact that an injury has been sustained while a seaman is employed in the service of a ship does not, standing alone, establish unseaworthiness, *Mosely v. Cia. Mar. Adra, S.A.*, 314 F.2d 223, 229 (2d Cir. 1963), *cert. denied*, 375 U.S.

829, 375 U.S. 835 (1963).

6. Plaintiff has the burden of proof on his claims of unseaworthiness of the Cape Jacob and negligence attributable to the United States. *Matter of Hechinger*, 890 F.2d 202, 207, 208 (9th Cir. 1989), *cert. denied*, 498 U.S. 848 (1990); *Ramos v. Matson Navigation Co.*, 316 F.2d 128, 131 (9th Cir. 1963). Though not relevant here, Plaintiff must also prove that any unseaworthiness or negligence was a proximate cause of his injuries. *E.g.*, *Lieberman v. Matson Navigation Co.*, *supra*, 300 F.2d at 662.

7. Plaintiff asserts the accident could have been prevented had Matson performed a formal risk assessment before the evolution began. He asserts that such assessments are a present requirement in certain circumstances for ships to be in compliance with the standardized International Safety Management System ("ISM") of the International Maritime Organization ("IMO"). However, there is no specific requirement in the ISM code for performance of a "formal risk assessment." Moreover, the ISM system is applicable only to private ocean shipping companies. 33 C.F.R. §96.210(b)(5), specifically exempts public vessels, including a "U.S. vessel of the National Defense Reserve Fleet owned by the U.S. Maritime Administration and operated in non-commercial service" - such as the Cape Jacob - from the requirement to institute ISM's particular safety system.

8. Moreover, the evidence presented in this case establishes to the Court's satisfaction that switching out the life raft canisters involved standard seaman's work and did not require any formalized assessment of risk. Plaintiff never identifies what would have been different about the operation had some kind of formal assessment been performed. He asserts he was told to use a forklift in the morning, and that he believed use of a forklift was easier - and safer.

9. Plaintiff has not met his burden of proving negligence attributable to the United States and the Court has found that no negligence on the part of the

United States, or its agents or employees, caused, or contributed in any manner to Plaintiff's injuries. Plaintiff's claims of negligence under the Jones Act are dismissed.

10. Plaintiff has not met his burden of proving unseaworthiness and the Court has found that no unseaworthiness of the vessel caused, or contributed in any manner to, Plaintiff's injuries. Plaintiff's claims of unseaworthiness are dismissed.

11. Maintenance and cure are no longer part of this action. The third cause of action is dismissed.

12. The Court finds that the further conclusions of law requested by the parties are either unsupported or unnecessary to the Court's determination.

13. Any conclusion of law that constitutes a findings of fact shall be treated as such.

DATE: March 25, 2011

DALE S. FISCHER
United States District Judge